UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **OFFSHORE SPECIALTY FABRICATORS, LLC, et al.,**<br>    **Plaintiff** | **CIVIL ACTION** |
| **VERSUS** | **No.   11-248** |
| **DUMAS INTERNATIONAL, INC.,**<br>    **Defendant** | **SECTION "E"** |

# OPINION

This matter was tried to the Court over four days on the claim of Plaintiffs Offshore Speciality Fabricators, LLC and Offshore Express, LLC (together, "OSF") against Defendant Dumas International, Inc. ("Dumas") for negligent work on one of OSF's vessels, and on Dumas's counterclaim against OSF for unpaid invoices for repair of damage resulting from failure of the vessel's engine.[1] The Court has original jurisdiction over the claims pursuant to 28 U.S.C. § 1333, as claims involving maritime tort and contract. *One Beacon Ins. Co. v. Crowley Marine Services, Inc.*, 648 F.3d 258, 262 (5th Cir. 2011); *Alcoa S.S. Co. v. Charles Ferran & Co.*, 383 F.2d 46, 50 (5th Cir. 1967). After hearing live testimony and reviewing all of the evidence, the Court rules for the following reasons that OSF is not entitled to recover on its claim for negligence but Dumas is entitled to recover for certain of its unpaid invoices.[2]

---

[1] The Court previously granted judgment under Federal Rule of Civil Procedure 52(c) against Dumas on its third-party complaint against NREC Power Systems, Inc. ("NREC") and against OSF on Dumas's third-party tender of NREC under Federal Rule of Civil Procedure 14(c).

[2] The Court also ordered post-trial briefing, which the parties filed. R. Docs. Nos. 85, 88, 89, and 90. Dumas was granted leave to file an oversize post-trial memorandum, R. Doc. No. 87, but was not granted leave to expand

**BACKGROUND**

OSF commenced this suit in admiralty against Dumas on February 7, 2011.  In it, OSF alleges that in September 2009 Dumas negligently aligned the starboard main engine of OSF's vessel the M/V OFFSHORE KING, leading to a broken crankshaft and catastrophic failure of the engine in February 2010, causing damage in the amount of $396,334.63 plus interest.[3]  Dumas counterclaims that OSF has failed to pay certain amounts invoiced for work it performed on the M/V OFFSHORE KING after the February 2010 failure, totaling (with attorneys' fees and interest) $104,033.35.

The M/V OFFSHORE KING is an offshore tug built in 1967 and owned and operated by OSF.  In July 2009, its starboard main engine ran dry of oil and failed because engine overheating caused bearing metal to "seize to" the crankshaft, though it did not break.  OSF then contracted with NREC to rebuild the engine.  NREC did so using an American Bureau of Shipping ("ABS") remanufactured crankshaft, and after ten hours of successful testing under load, ABS certified the engine.

In September 2009, Dumas's employee Frank Weekly performed an alignment of

---

the record by also submitting deposition testimony not introduced or admitted at trial.  Accordingly, the Court strikes that testimony, contained in Exhibits A and B to R. Doc. No. 88.

[3]   "A ship repairer potentially faces three sources of liability for repairs he performs improperly on a vessel. He may be liable in contract for a breach of his expressly assumed obligations or for a breach of an implied warranty of workmanlike performance that attaches to admiralty contracts under the rule of *Ryan Stevedoring Co. v. Pan–Atlantic S.S. Corp.*, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956). A ship repairer may also be liable for the maritime tort of negligence. Importantly, negligence causes of action in admiralty invoke the principles of maritime negligence, not those of the common law."  *La Esperanza de P.R., Inc. v. Perez y Cia de P.R., Inc.*, 124 F.3d 10, 16 (1st Cir. 1997).  OSF has elected to proceed under a negligence theory.

the starboard main engine using a laser alignment tool, a task he had also performed in March 2009. By mid-October 2009, the M/V OFFSHORE KING was back in service. On February 12, 2012, the starboard main engine's crankshaft cracked.

Beyond the above, the parties dispute most of the facts. OSF asserts that the engine failure is the fault of Dumas, the alignment specialist, because it failed to align the engine properly in September 2009 after NREC rebuilt it. It highlights Dumas's admission that it was Dumas's responsibility to properly align the engine and the purportedly limited training of Weekly. It also highlights difficulties Weekly had drilling holes for certain "body bound bolts" necessary to secure the engine in place, as well as Weekly's allegedly improper use of a torch to cut the holes necessary for the bolts. OSF then highlights Weekly's failure to note in his written accounts of the work that he actually used the necessary body bound bolts, as well as their alleged absence in inspections of the engine after the incident. After the engine failed, NREC's employee Shawn Chaisson confronted Weekly about allegedly inconsistent readings concerning the engine's alignment, and Weekly allegedly agreed the engine was out of alignment.

Dumas responds that Weekly was properly trained on the laser and that he credibly testified he was confident he had used it correctly. He also testified that he used a torch to cut the body bound bolt holes at the direction of OSF. Dumas next contends that the testimony of Shawn Chaisson and another alignment technician who testified, Dwayne Dupuy, was inconsistent and unreliable. It also challenges OSF's proof of causation, asserting that first, there were errors in the measurements that purportedly establish the engine was out of alignment after the crankshaft broke in Feburary 2010, and in any event, any misalignment was so slight as to be irrelevant. Dumas also notes that the M/V

3

OFFSHORE KING had to be dragged through mud and ran aground at least once, events that could have thrown the engine out of alignment, between the time Dumas's technician aligned the engine in September 2009 and the February 2010 failure. As support for its belief that the grounding caused any misalignment that may have led to the failure in February 2010, Dumas notes that the starboard engine operated without incident for months after the September 2009 alignment (when, if the engine were as misaligned as OSF suggests, it would not have) and that the port engine was also found to be out of alignment at the time of the failure (and therefore also after the grounding).

## STANDARD OF LAW

Admiralty law principles govern the maritime negligence and contract disputes in this case. *Int'l Mar., LLC v. Delta Towing*, LLC, 704 F.3d 350, 354 (5th Cir.2013). State contract law principles may also be applied, to the extent they are not inconsistent with admiralty law. *Ham Mar., Inc. v. Dresser Indus., Inc.*, 72 F.3d 454, 459 (5th Cir.1995). OSF has the burden on its maritime negligence claim to establish both fault and causation, and Dumas has the burden of proof on its contract claim. *Marquette Transp. Co., Inc. v. La. Machinery Co., Inc.*, 2002 WL 1809092, at *14 (E.D. La. 2002), *rev'd on other grounds*, 367 F.3d 398 (5th Cir. 2004); *Layrisson v. H.S.S. Vending Distrib.*, 1998 WL 355461, at *2 (E.D. La. June 26, 1998); *see Int'l Marine LLC v. Delta Towing LLC*, 704 F.3d 350, 354 (5th Cir. 2013). Both burdens require proof by a preponderance of the evidence. *Id.* "A preponderance of the evidence simply means evidence that persuades [the Court] that the plaintiff's claim is more likely true than not true." 5th Cir. Pattern Civil Instruction 2.20 (West 1998); *see Layrisson*, 1998 WL 355461, at *2.

While circumstantial evidence may be sufficient to establish negligence and

causation, it must permit "strong inferences" of the same. *Marquette Transp. Co., Inc. v. La. Machinery Co., Inc.*, 367 F.3d 398, 404 (5th Cir. 2004). The identity of the party in "control or possession" of the vessel at the time of the incident is one factor courts consider when determining whether circumstantial evidence of negligence or causation is sufficient. *Fairest-Knight v. Marine World Distributors, Inc.*, 652 F.3d 94, 101 (1st Cir. 2011).

## ANALYSIS

Effectively three issues remain: (1) whether OSF is entitled to an adverse inference against Dumas for failing to provide certain documents; (2) whether OSF has met its burden to show that the February 12, 2010, failure of its starboard engine was caused by the September 2009 negligence of Dumas; and (3) whether Dumas has shown it is entitled to payment of its open invoices for work performed on OSF's vessel in February and March 2010. The Court addresses each in turn.

### I.     Adverse Inference

OSF asserts that Dumas should be sanctioned with an adverse inference for allegedly destroying certain laser logs. After the engine failed on February 12, 2010, and OSF questioned whether the laser Weekly had used in attempted repairs was properly calibrated, Dumas sent its laser to a firm, Ludeca, to perform a calibration check. When the laser came back, all of the results in its memory had been wiped. OSF asserts that the Court should draw an adverse inference that these wiped logs contained evidence unfavorable to Dumas's position.

In order for an adverse inference to be proper, the party seeking the inference must prove that the party who destroyed the evidence acted in bad faith. *King v. Illinois Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003). James Dumas, Dumas's owner and the person who

5

sent the laser for the calibration check, credibly testified that he did not intend for Ludeca to wipe the logs, he did not know Ludeca would wipe the logs, and if he had, he would have printed the logs out.[4] There is no evidence of bad faith. Accordingly, OSF's request for the adverse inference with respect to the laser logs is denied.[5]

OSF also requests an adverse inference because James Dumas did not keep notes of his alleged discussions with OSF personnel and did not produce a copy of the tally book he normally carries with him on jobs, and because Dumas did not produce the laser logs of measurements by John Boland, owner of Boland Consultants and the person who worked with Weekly after the February 2010 engine failure. But James Dumas credibly testified that he repeatedly asked Boland for copies of his laser's logs, yet the logs were never sent to him.[6] OSF has adduced no evidence of the bad faith necessary to merit an adverse inference.[7] Similarly, there is no evidence of bad faith in James Dumas's failure to keep notes or to produce a tally book.[8] OSF's request for an adverse inference based on these

---

[4] R. Doc. No. 84-7, pp. 28, 70.

[5] Dumas was able to produce the records for the September 2009 alignment. The wiped logs pertain only to alignments performed by Dumas for OSF in February 2010, which are the subject in part of Dumas's counterclaim.

[6] R. Doc. No. 84-7, pp. 39–40. Boland also testified that he had moved offices three times and thrown away hundreds of pounds of paper. R. Doc. No. 87-5, p. 60. Those included "probably . . . a thousand alignment things in the last five years." R. Doc. No. 84-5, p. 109. The Court also notes that no records from BNA's laser were offered. R. Doc. No. 84-6, p. 45.

[7] OSF would have needed to adduce evidence of bad faith on the part of Dumas, not Boland, to support this claim.

[8] The testimony elicited from Dumas on this point is as follows:
   Q:   Did you take a notebook with you and

facts is also denied.

## II.    Negligence

The Court turns next to OSF's allegation that Dumas negligently aligned the starboard main engine in September 2009, causing the engine to fail in February 2010. There is no dispute that Dumas owed OSF a duty to align the engine properly. OSF advances, in essence, two theories why Dumas breached this duty. The first is that Dumas's technician Weekly incompetently aligned the engine in September 2009. The second is that, whether or not Weekly properly aligned the engine, he failed to use body bound bolts to secure the engine so that it would not move out of alignment.

The Court is not persuaded that Weekly incompetently aligned the engine in September 2009. In the first instance, the Court is persuaded that Weekly was well trained on the Rotalign laser tool he used to perform the alignment. The Court credits his testimony about his training and comfort level,[9] as well as the testimony of Boland—clearly an expert in the device—who trained Weekly.[10] OSF's argument that Weekly was unfamiliar

---

          keep any notes, knowing that there was a situation going on, about what you saw, who you talked to, what you did?
A:    I probably wrote down some notes in one of my books. I usually carry a little tally book with me.
Q:    Most people do. Where's that tally book?
A:    At my office.
Q:    It hasn't been produced in this case, has it?
A:    No, sir.
R. Doc. No. 84-7, p. 51. This exchange offers no evidence of bad faith.

[9]    R. Doc. No. 84, pp. 55–57.

[10]    R. Doc. No. 84–5, pp. 57–58.

with certain rules for operating the Rotalign tool, such as the belief of OSF's witnesses that it must be turned as far as possible, is unpersuasive, as Dumas's witnesses credibly testified that a full rotation of the tool is not necessary and OSF's witnesses were not as familiar with the tool as Dumas's.[11]

OSF's argument that Weekly must have misaligned the engine in September 2009 because he used incorrect drive-train dimensions when programming the Rotalign tool is also without merit. As Weekly, Boland, and Dumas's expert John Piotrowski all credibly testified, incorrectly input dimensions do not result in an incorrect alignment.[12] They only increase the number of corrections, in essence steps, required to obtain a proper alignment. The actual measurement of alignment is unaffected—only the feedback provided by the Rotalign concerning the adjustments necessary to correct the alignment is affected.

This point was made persuasively by Dumas's expert, John Piotrowski, the testimony of whom the Court grants considerable weight in light of his extensive experience and the Court's assessment of his credibility.[13] Piotrowski explained the role that inputting dimensions into the laser plays thusly:

> A:   . . . So, in other words, it's like someone has said, There's a target over there, John, a red dot on that chair back there. And I can't see it, but

---

[11]   R. Doc. No. 84, p. 59; R. Doc. No. 84-2, pp. 28–29, 75; R. Doc. No. 84-6, p. 102.

[12]   R. Doc. No. 84, p. 9 (Weekly); R. Doc. No. 84-4, p. 31 (Boland); R. Doc. No. 84-6, pp. 107–09 (Piotrowski).

[13]   Piotrowki has over 32 years of experience with rotating machinery and is one of the leading experts in the field. R. Doc. No. 84-6, p. 64. In addition to authoring numerous technical articles and writing monographs in this area, he has been involved in writing software for laser alignment systems such as those involved in this case, including, but not limited to, for the manufacturer of the Rotalign laser. *Id.*; R. Doc. No. 84-6, pp. 64–65.

> I have a calibrated arm, and you hand me a bean bag and you say, "Throw the bean bag and have it hit that red dot." And I ask you, "How far is that red dot away?" And you said it's 65 feet and it's really 130 feet, so I calibrate based on your dimension that you gave me how hard I have to throw the bean bag. And the bean bag lands halfway between me and the red dot that's really 130 feet away. So then I am a very compliant person. You say, "You missed." So I pick up the bean bag now, but now I'm closer, and I just continue to iterate throwing it until I continue to get to my final goal. The laser won't let you stop until you get to the bean bag — you get the bean bag to the red dot.
> Q: So using your example, if someone had told you to throw the bean bag the exact distance the first time, it just would have saved you a couple of steps?
> A: The laser would have said, "You guys did this right. Nice job."
> Q: But once the bean bag is on the red dot —
> A: You're done.[14]

As Weekly credibly testified, and as supported by documentary evidence, the final alignment readings he received in September 2009 showed the engine was in alignment.[15] This conclusion is bolstered by the fact that there is no evidence Weekly misaligned the engine when he performed work on it in March 2009, months before the September 2009 alignment. Crediting Piotrowski's testimony, the Court finds it is irrelevant whether Weekly input incorrect dimensions into the Rotalign.[16]

Without any direct evidence that Weekly misaligned the engine in September 2009, and without circumstantial evidence that Weekly was not competent to perform the alignment, OSF's best argument is that the manner in which the crankshaft broke in February 2010 suggests that the engine was misaligned. This is effectively a *res ipsa loquitur* argument: The crankshaft broke in a way that suggests misalignment (an

---

[14] R. Doc. No. 84-6, pp. 107–08.

[15] R. Doc. No. 84, p. 31. Exhs. 16-1, 29-21 to 29-27.

[16] R. Doc. No. 84-6, pp. 120–21 (Q: "But [incorrect dimensions] in no way affect[] whether the engine is in alignment?" A: "That is correct.").

9

"unexplained happening of an event which, in the ordinary course of things, would not occur in the absence of negligence"), Weekly performed the alignment, ergo, Weekly (and so Dumas) was negligent. *Great Am. Ins. Co. v. Pride*, 847 F. Supp. 2d 191, 205 (D. Me. 2012). But before such an inference is proper, the plaintiff must show that "(1) the thing which caused the injury was under the exclusive control of the defendant"; (2) "the injury is such as in the ordinary course of things does not occur if one having exclusive control exercises proper care;" and (3) "the injury was not due to any negligence on the part of the plaintiff." *Id.*

OSF has not, and cannot, show that Dumas had exclusive control of the vessel or its engine after the engine's alignment in September 2009. In *Pride*, the mere fact that the plaintiff took the ship out for between six to eight hours the day after new wiring was installed was sufficient for the court to conclude that plaintiff "had exclusive control over the [ship] and its engine." *Id.* Here, OSF was in possession of the M/V OFFSHORE KING from at least the time it went back into service in mid-October 2009 until the engine failed on February 12, 2010, during which time the engine ran for 800 hours.[17]

OSF also argued that Weekly was negligent in failing to use body bound bolts in September 2009. But even assuming without deciding that Weekly did fail to use body bound bolts or their equivalent, and that the failure to use them was negligent, OSF has not satisfied its burden to show that Weekly's negligence was the cause of the engine's failure.

"'Under the general maritime law, a party's negligence is actionable only if it is the 'legal cause' of the plaintiff's injuries,' which is 'something more than 'but for' causation [—]

---

[17] R. Doc. No. 84-2, p. 116.

the negligence must be a substantial factor' in causing the injuries." *In re Great Lakes Dredge & Dock Co., LLC*, 624 F.3d 201, 213–14 (5th Cir. 2010) (quoting *Donaghey v. Ocean Drilling & Explor. Co.*, 974 F.2d 646, 649 (5th Cir. 1992)). In the first instance, the Court is not persuaded by the post-failure investigation that the engine was out of alignment at the time it failed in February 2010.[18] As Boland and Piotrowski credibly testified, the supposed "200" and "400" readings in March 2010 that led OSF to believe the engine was out of alignment were, in fact, the result of errors interpreting decimal points.[19]

Even if the engine was out of alignment after Dumas's work in September 2009, however, the Court credits the testimony from Boland that, had the engine been as out of alignment after Dumas completed its September 2009 work as OSF asserts, it would not have been possible for the vessel to operate successfully between September 2009 and February 2010. Assuming, contrary to the above (but consistent with the nature of the crankshaft's failure) that the engine *became* misaligned sometime after Dumas completed its work, OSF has not shown how Weekly's failure to use body bound bolts was either a "but for" cause of the misalignment or a "substantial factor."

An equally plausible legal cause for any misalignment is the fact that the M/V OFFSHORE KING was grounded between the September 2009 alignment and the engine

---

[18]  Whether, during repairs in February and March 2010—after the engine failed—it was found to be out of alignment is barely probative of whether it was out of alignment before the failure. The failure was severe, and the Court has little difficulty believing that the failure alone, to say nothing of the work after it, could have resulted in changes to the alignment.

[19]  R. Doc. No. 84-6, p. 18 ("Somebody took a reading that doesn't know how to take the reading correctly.") (Boland); *id.* pp. 114–20 (Piotrowski explaining how such errors occur).

failure in February 2010.[20] Where there are "opposing, but equally reasonable, theories regarding the cause" of a maritime incident, "one which sponsors a determination that the defendant is at fault and one which sponsors a determination that the accident was caused without defendant's fault, 'the Court will not rely on 'speculation,' but will find for the defendant." *Marquette*, 2002 WL 1809092, at *14.

Although OSF's witnesses purported to exclude the grounding of the vessel as a cause, the Court finds that cross-examination discredited their testimony.[21] But the Court cannot conclude that the grounding was the cause either. As Piotrowski credibly testified, there is simply insufficient information to determine what caused the engine to fail in February 2010.[22] OSF has failed to prove by a preponderance of the evidence that any negligence on the part of Dumas was the legal cause of the February 12, 2010, incident.

### III. Dumas's Counterclaim

Dumas asserts that OSF is liable to it for payment of two invoices related to work Dumas performed after the engine failure. The first, for $7,732.50, covers work performed on February 17–20, 2010.[23] The second, for $38,467.31, covers work performed on February 25–26 and March 2–8, 11, 18–20, 22–24, and 29, 2010.[24] At trial, James Dumas

---

[20] R. Doc. No. 84-3, p. 44. Dumas advanced a number of other theories for the engine's failure, for example, torsional coupling, improper line boring of the cylinder block, and problems with a vibration damper. The Court rejected those theories when it dismissed Dumas's claim against NREC.

[21] R. Doc. No. 84-2, pp. 79–81.

[22] R. Doc. No. 84-6, pp. 151, 159.

[23] Exh. 30-8.

[24] Exhs. 30-29 to 30-34.

testified that he did not intend to charge OSF for work performed after March 11, so the total Dumas actually claims for the second invoice is $27,711.69.[25]

The evidence establishes that OSF formed an oral contract with Dumas to perform the work billed in February 2010 through March 11, 2010. In the first instance, OSF conceded in the pretrial order that "[i]n February and March of 2010, OSF retained Dumas to perform work on the M/V OFFSHORE KING."[26] James Dumas then credibly testified at trial that the work Dumas performed during this time was at OSF's oral request.[27] That is all that is required. "'Oral contracts are generally regarded as valid by maritime law,'" and "it is 'not unusual' for parties to enter into an oral agreement for repair work." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 265 (5th Cir. 2011) (quoting *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961) & *B&B Schiffahrts GmbH & Co. v. Am. Diesel & Ship Repairs, Inc.*, 136 F. Supp. 2d 590, 592 (E.D. La. 2001)). OSF is therefore incorrect when it states that "[n]o contracts existed between Dumas and OSF."[28]

The Court concludes that the oral agreement between OSF and Dumas for the work performed after the engine failed and through March 11, 2010, calls for payment of a

---

[25] R. Doc. No. 84-7, p. 60.

[26] R. Doc. No. 52, p. 19.

[27] R. Doc. No. 84-7, pp. 24, 32.

[28] R. Doc. No. 85, p. 16. OSF does not appear to argue that only Tom Fairley, the CEO of OSF, could contract on its behalf—only that Fairley was the OSF employee who would have had to approve the interest and attorneys fees provisions included in Dumas's invoices. But to the extent OSF does argue that only Fairley, not its port captain Earl Carmichael, could contract on its behalf, the record does not support such a conclusion. Fairley only testified that his *approval* was necessary for "spending decisions" over $25,000—not that other OSF personnel lacked the authority (real or apparent) to enter into contracts.

13

reasonable and customary amount for services performed in a workmanlike manner. OSF asserts that Dumas did not perform the work in a workmanlike manner—going so far as to say that "Dumas did not provide anything of value and accomplished nothing."[29] The Court disagrees. The evidence at trial—from Weekly and Boland—establishes that, in addition to other tasks, Dumas competently re-aligned the starboard main engine.

The Court gives little weight to the testimony from the representative of BNA Marine Services, which OSF hired to check and ultimately re-perform the alignment work done by Dumas. BNA had an obvious incentive to find error with Dumas's work—the opportunity to re-perform the work—and the testimony at trial indicates BNA's representative was not familiar with the Rotalign laser used by Weekly and Boland.[30] Weighed against the documentary evidence and testimony of Weekly, Boland, and Shawn Chaisson, the Court finds that OSF had no basis for refusing to pay Dumas's invoices because "the work was not up to par, didn't meet the standards of what [OSF] paid for."[31]

OSF is not, however, liable for charges invoiced that Dumas did not actually incur. Dumas stopped using its laser when it was sent for calibration at the end of February 2010 and instead used Boland's laser tool starting March 2, 2010, even after Dumas received its tool back.[32] Boland never invoiced Dumas for the cost of using his laser. Accordingly,

---

[29] R. Doc. No. 85, p. 23.

[30] R. Doc. No. 84-2, p. 75.

[31] R. Doc. No. 84-3, p. 24.

[32] There is a conflict in testimony, with Boland stating that he used his laser only once, R. Doc. No. 84-5, p. 61, and Dumas testifying that Boland's laser was used even after Dumas received its laser back. R. Doc. No. 84-7, p. 39. But inasmuch as Dumas's position is that it used Boland's laser, and it is undisputed that Boland did not charge Dumas for this service, Dumas has

14

Dumas's daily charge of $800.00 for a laser on March 2–3, 5, 7–8, and 11, 2010, is not recoverable, and the amount of the second invoice is reduced by $4800.00 to $22,911.69.

While the evidence clearly establishes the existence of a contract calling for a reasonable fee, it is less clear whether the parties' agreement contains other terms. When Dumas billed OSF, it did so on invoices providing for 2% monthly interest and 35% attorneys' fees on uncollected amounts. Dumas asserts it is entitled to those terms, because OSF paid an unrelated invoice containing those terms in March 2009[33] and, "[u]nder general maritime law, terms and conditions contained in subsequently-issued purchase orders may supplement an oral agreement if there is evidence of a prior course of dealing between the parties from which a court may infer that the parties were aware of and consented to those additional contractual terms." *One Beacon Ins.*, 648 F.3d at 265.

Dumas is right that a course of dealing may allow the imputation of later-specified terms to the time of the parties' oral agreement. Dumas is incorrect, however, that mere payment of one invoice suffices to establish a course of dealing. While "courts have found a course of dealing between parties to a maritime contract based on a party's receipt of as few as three or four bills of lading containing the same . . . terms, and upon a party's approval of only nine invoices containing identical . . . clauses," Dumas has not cited—and the Court has not found—a case where a course of dealing was found based on only one prior transaction. *Id.* at 266. Fairley's credible testimony at trial that a term providing for interest and attorneys' fees on unpaid invoices is unusual in the oilfield also militates

---

failed to prove that the laser charges it invoiced after sending its laser for realignment are recoverable.

[33] R. Doc. No. 84-7, p. 34.

against a finding that would impute an expectation of this term to OSF.[34] The Court finds as a matter of fact that OSF and Dumas did not have a course of dealing sufficient to allow Dumas to rely on later-specified terms in its invoices as terms of the parties' contract.

While Dumas may not recover attorneys' fees or prejudgment interest under the term on its invoice, "[u]nder maritime law, the awarding of prejudgment interest is the rule rather than exception, and, in practice, is well-nigh automatic." *Reeled Tubing, Inc. v. M/V CHAD G*, 794 F.2d 1026, 1028 (5th Cir. 1986). "[I]n this Circuit prejudgment interest is ordinarily awarded from the date of the loss." *Id.* "Admiralty courts in setting the[] rates [of prejudgment interest] have broad discretion and may look to state law or other reasonable guidelines indicating a fair level of compensation." *Todd Shipyards Corp. v. Auto Trasp., S.A.*, 763 F.2d 745, 753 (5th Cir. 1985).

This Court sits in Louisiana, and the incident giving rise to this judgment occurred in Louisiana. Louisiana law set the rate of judicial interest at 3.75% in 2010 and at 4.00% from 2011 through 2013. The Court exercises its discretion to award prejudgment interest in those amounts or, specifically, in the amount of 3.75% from March 26, 2010, through December 31, 2010, and in the amount of 4.00% from January 1, 2011, through judgment on the $7732.50 due on the first invoice, and in the amount of 3.75% from April 30, 2010, through December 31, 2010, and in the amount of 4.00% from January 1, 2011, through judgment on the $22,911.69 due on the second invoice. Prejudgment interest shall be compounded on an annual basis. Postjudgment interest shall be assessed as provided in 28 U.S.C. § 1961.

---

[34] R. Doc. No. 84-3. p. 25.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that judgment be entered in favor of Dumas and against OSF on OSF's claim and **IT IS FURTHER ORDERED** that judgment be entered in Dumas's favor and against OSF on Dumas's claim in the amounts of $7732.50 and $22,911.69, with interest as set forth above.

**New Orleans, Louisiana, this 12th day of November, 2013.**

_____
**SUSIE MORGAN
UNITED STATES DISTRICT JUDGE**